IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| **HOWARD BRODY, M.D., PH.D.** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **CIVIL ACTION NO. 3:16-cv-359** |
| **v.** | § | |
| | § | |
| **UNIVERSITY OF TEXAS** | § | |
| **MEDICAL BRANCH,** | § | |
| | § | |
| *Defendant.* | § | **JURY TRIAL DEMANDED** |

PLAINTIFF HOWARD BRODY'S
ORIGINAL COMPLAINT

Plaintiff Howard Brody, M.D., Ph.D. files this lawsuit against defendant University of Texas Medical Branch based on its retaliation, discrimination, and harassment.

**I.**
**OVERVIEW OF CLAIMS**

Howard Brody, M.D., Ph.D, is a nationally recognized physician with a doctorate in philosophy who has had stellar careers at both Michigan State University and The University of Texas Medical Branch ("UTMB). In 2006, Dr. Brody was recruited to serve as UTMB's Director of the Institute of Medical Humanities. He served capably in that position until he was suspended, banished, demoted, and retaliated against for participating in an investigation of another UTMB professor. UTMB used a facially neutral policy to effectuate its unlawful actions against Dr. Brody. Dr. Brody has exhausted his administrative remedies and now asserts claims under Title VII, Title IX, and § 1983.

## II.
### PARTIES

1.      Plaintiff Howard Brody is a citizen and resident of the State of Texas.

2.      Defendant University of Texas Medical Branch ("UTMB") is a component of the University of Texas System located in Galveston, Texas, and is a recipient of federal financial assistance. Defendant UTMB may be served with process by serving its registered agent, Sandra Y. Benigar, at 301 University, Route 0985, Galveston, Texas 77555, or wherever it may be found.

## III.
### JURISDICTION AND VENUE

3.      The Court has jurisdiction over the Title VII retaliation claim because it arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. Therefore, in accordance with 28 U.S.C. § 1331, the Court has original jurisdiction over this claim.

4.      The Court has jurisdiction over the Title IX retaliation claim because it arises under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a). Therefore, in accordance with 28 U.S.C. § 1331, the Court has original jurisdiction over this claim.

5.       The Court has jurisdiction over the § 1983 claim because it arises under 42 U.S.C. § 1983. Therefore, in accordance with 28 U.S.C. § 1331, the Court has original jurisdiction over this claim.

6.      Venue is appropriate and proper in the United States District for the Southern District of Texas, Galveston Division, pursuant to 28 U.S.C. § 1391, because Defendant UTMB resided in, did business in and conducted business in Galveston, Texas,

during the period in question, and a substantial part, if not all, of the acts and conduct charged herein occurred in this District.

## IV.
### CONDITIONS PRECEDENT

6.      All conditions precedent have been performed or have occurred.

## V.
### FACTS AND ALLEGATIONS

7.      Howard Brody received his M.D. from the College of Human Medicine, Michigan State University ("MSU") in 1976, and his Ph.D. in Philosophy, also from MSU, in 1977.

8.      After completing his residency in family medical practice at the University of Virginia Medical Center, Charlottesville, Howard Brody returned to MSU, where he eventually served as University Distinguished Professor of Family Practice, Philosophy, and the Center for Ethics and Humanities in the Life Sciences.

9.      Howard Brody was the Director of MSU's Center for Ethics and Humanities from 1985 to 2000.

10.     In 2000, Howard Brody received the "Boss of the Year" award from the MSU Business Women's Association.

11.     Howard Brody received numerous awards and honors, including the Teacher-Scholar Award and the Distinguished Faculty Award from Michigan State University and the Presidential Citation Award from the Michigan State Medical Society. In 2003 he was listed in the "Guide to America's Top Physicians" of the Consumers Research Council of America. In 1995, Howard Brody was elected to the Institute of Medicine (now the National Academy of Medicine), National Academy of Sciences.

12.     In 2006, Howard Brody was recruited to the University of Texas Medical Branch at Galveston, to become the Director of the Institute for the Medical Humanities ("IMH") and John P. McGovern Centennial Chair in Family Medicine.

13.     In 2009, Howard Brody received a Lifetime Achievement Award from the American Society for Bioethics and Humanities.

14.     Howard Brody has written over 125 articles on medical ethics, family medicine, and philosophy of medicine.

**A.      Title IX Investigation**

15.     On March 4, 2014, Stevi Darrow and Rachel Pearson, graduate students at IMH, met with Howard Brody.

16.     During the March 4, 2014 meeting, Stevi Darrow and Rachel Pearson notified Howard Brody that they "intended to file a sexual harassment complaint regarding [Professor Mark Clark] with [the] Title IX office at UTMB" and wanted to make Howard Brody aware before proceeding with this course of action.

17.     Howard Brody responded by: (1) assuring both students of their right to file a complaint; (2) explaining the need to protect the students from any form of retribution for filing a complaint; and (3) expressing his hope that the Title IX investigation would be fair to all parties and lead to closure.

18.     Stevi Darrow and Rachel Pearson filed a sexual harassment complaint with the Title IX office at UTMB on March 4, 2014, the same day that they met with Howard Brody.

19.     Catherine Riley, the Title IX investigator, requested a meeting with Howard Brody on March 5, 2014.

20.     At the March 5, 2014 meeting, Catherine Riley informed Howard Brody that Mark Clark was the subject of a Title IX investigation and requested that Howard Brody notify Mark Clark orally and provide Mark Clark with a notice of the investigation and a non-retaliation instruction.

21.     Immediately after the meeting, Howard Brody notified Mark Clark orally and delivered the notice of the investigation and the non-retaliation instruction to Mark Clark, as requested.

22.     Howard Brody was not interviewed in connection with the Title IX investigation until April 11, 2014.

23.     The Title IX Investigative Summary Report was completed on May 13, 2014.

24.     According to the Title IX Investigative Summary Report, interviews concluded on April 4, 2014, even though this was a few weeks before Howard Brody was interviewed.

25.     According to the Title IX Documentation Worksheet, Mark Clark was interviewed on April 9, 2014 and again on April 10, 2014. Both interviews took place after interviews had supposedly concluded.

26.     According to the Title IX Documentation Worksheet, Howard Brody was interviewed on April 11, 2014. The interview took place after interviews had supposedly concluded.

27.     According to the Title IX Investigative Summary Report, two students made allegations against Mark Clark. According to the summary of Howard Brody's grievance hearing provided to UTMB's president, four students made allegations against Mark Clark.

28.     According to the Title IX Investigative Summary Report, "seventeen faculty, staff, and students reported they had observed touching, stroking, brushing against another, and invasion of space on numerous occasions." Howard Brody had no first-hand knowledge of any of this behavior.

29.     Mark Clark resigned from his employment with UTMB on or about June 2, 2014.

**B.     Disciplinary Letter**

30.     At Howard Brody's Annual Review on July 30, 2014, Danny Jacobs, Executive Vice President, Provost and Dean of the School of Medicine, told Howard Brody that "some steps [of the review] would have to be postponed, due to [Howard's] involve[ment] in an HR investigation."

31.     The next day, on July 31, 2014, Howard Brody asked Ronald McKinley, Chief Human Resources Officer, about the HR investigation mentioned by Danny Jacobs at the Annual Review. Ronald McKinley assured Howard Brody that there was no separate investigation directed at him and that Danny Jacobs was merely referring to the Title IX investigation of Mark Clark.

32.     On October 7, 2014, Howard Brody received a disciplinary letter stating "UTMB's Human Resources Department conducted a supplemental investigation concerning your behavior." Ironically, this statement is in direct conflict with Ronald McKinley's assurance that there was no separate investigation into Howard Brody.

33.     The disciplinary letter informed Howard Brody that: (1) he was removed from his role as Director of the Institute for the Medical Humanities; (2) he was placed on a one year leave of absence; (3) his total compensation was reduced from $271,177.00

to $141,238.00; and (4) he was required to attend a training course regarding employee relations in Atlanta, Georgia at his own expense.

34.    The disciplinary letter states that Howard Brody violated "UTMB's IHOP Policy 3.2.4 – Sexual Harassment and Misconduct, which requires supervisors to report sexual harassment and misconduct complaints to UTMB's Human Resource Department within three business days" by failing to report complaints between March 2011 and March 2014 to UTMB's Human Resources Department.

35.    UTMB's IHOP Policy 3.2.4 – Sexual Harassment and Misconduct actually requires that "[a]ny faculty member or administrative personnel who gains knowledge of an alleged act of discrimination, which violates this policy, must report the incident within three (3) business days to Employee Relations." The policy is not limited to supervisors as UTMB claims in the disciplinary letter. Instead, its terms expressly apply to any and all faculty members or administrative personnel who become aware of "an alleged act of discrimination."

36.    The 3-day requirement of UTMB's IHOP Policy 3.2.4 has been applied to Howard Brody in spite of his having been provided nothing more than hearsay—ever—of any alleged act of discrimination. In each case in which Howard Brody was provided hearsay or gossip about potential alleged discrimination, he promptly advised the individual communicating the information of the policy and procedure to be followed.

37.    The disciplinary letter states "it was alleged that between approximately March 2011 and March 2014, several faculty members reported to you allegations of sexual harassment and inappropriate behavior involving [Mark Clark], but you failed to report these complaints to UTMB's Human Resources Department." This statement is misleading in that no individual ever "reported to" Howard Brody such allegations.

Instead, they advised Howard Brody that they were personally aware of concerns about Mark Clark.

38.     UTMB's position is that Howard Brody violated UTMB's IHOP Policy 3.2.4 because individuals who themselves were subject to the policy opted to speak with Howard Brody first, instead of Employee Relations, in direct violation of UTMB's IHOP Policy 3.2.4. That position is supported neither by the policy or applicable law.

39.     UTMB severely punished Howard Brody for his alleged violation of UTMB's IHOP Policy 3.2.4, which he either did not violate at all, or violated to a lesser degree than every faculty or administrative personnel that approached him. At the same time UTMB declined to punish in any manner *any* of those faculty or administrative personnel who were directly aware of alleged sexual harassment by Mark Clark.

40.     The faculty and administrative personnel who approached Howard Brody between March 2011 and March 2014 admit in their Title IX investigation interviews that they had direct knowledge of Mark Clark's behavior. None of these employees reported to Employee Relations in direct violation of UTMB's IHOP Policy 3.2.4, and none of those employees has faced any consequence for breaching IHOP Policy 3.2.4.

## C.     **Faculty Grievance Hearing**

41.     Howard Brody promptly filed a formal grievance on October 8, 2014 pursuant to UTMB's Faculty Grievance Policy.

42.     Howard Brody requested that: (1) his role as Director of the Institute of Medical Humanities be restored; (2) his badge and keys returned; (3) he would have immediate access to his office including all relevant computer files and library resources;

(4) his compensation be restored to its original level; and (5) that he would receive retroactive reimbursement to October 3, 2014.

43.     Howard Brody was eventually granted a hearing on July 23, 2015, nearly nine months after filing his formal grievance.

44.     In the hearing, UTMB referred to events prior to the March 2011 to March 2014 window originally cited in Howard Brody's disciplinary letter. This is another example of UTMB's shifting justification.

45.     On August 5, 2015, the Faculty Grievance Hearing Panel submitted a summary of the hearing as well as its findings to David Callender, President of UTMB.

46.     On August 11, 2015, David Callender notified Howard Brody that the disciplinary actions against him were upheld.

47.     Howard Brody filed an EEOC Charge of Discrimination based on sex, age, disability, and retaliation against UTMB on January 21, 2016.

48.     In UTMB's Position Statement dated February 29, 2016, UTMB claims that it conducted a supplemental investigation regarding Howard Brody. This statement is in direct conflict with Ronald McKinley's assurance that there was no separate investigation into Howard Brody. UTMB either lied to the EEOC or lied to Howard Brody about the existence of a supplemental investigation.

49.     UTMB has failed to provide any evidence whatsoever of a supplemental investigation into Howard Brody.

D.     **IHOP Policy 3.2.4. is a Pretext**

50.     All of the faculty members and administrative personnel that approached Howard Brody between March 2011 and March 2014 about Mark Clark's questionable

behavior are in direct violation of UTMB's IHOP Policy 3.2.4 requiring that they report directly to Employee Relations within three (3) days.

51.     In every instance between March 2011 and March 2014 where questionable behavior was brought to Howard Brody's attention by a faculty member or administrative personnel, that employee had direct knowledge of the behavior and Howard Brody did not.

52.     UTMB has not disciplined in any manner any of the faculty and administrators who approached Howard Brody between March 2011 and March 2014 in direct violation of UTMB's IHOP Policy 3.2.4.

53.     UTMB has not disciplined in any manner any of the faculty and administrators who admitted to having just as much second-hand knowledge of alleged sexual harassment as Howard Brody in their respective Title IX interviews.

54.     UTMB has not disciplined in any manner any of the faculty and administrators who admitted to having direct, first-hand knowledge of alleged sexual harassment in their respective Title IX interviews.

55.     UTMB fostered and continues to foster an environment where faculty and administrators can 'pass the buck' to colleagues and avoid reporting alleged sexual harassment directly to Employee Relations as required by UTMB's IHOP Policy 3.2.4.

56.     UTMB completely overhauled its IHOP Policy 3.2.4 on July 1, 2015. We note that the policy: (1) increased from 5 pages to 18 pages in length; (2) now requires reporting of sexual harassment directly to the Title IX Coordinator, when the original policy made no mention of Title IX anywhere; and (3) now requires all "Responsible Employees" to report alleged sexual harassment within 3 days.

57.     "Responsible Employees" in the current version of IHOP Policy 3.2.4. "include all administrators, faculty, supervisory staff, advisors, graduate teaching assistants, and faculty who have a responsibility for students in the following capacities: teaching; advising; coaching or mentoring; or supervising in a clinical setting."

58.     UTMB rewrote its policy because its first policy did not comply with Title IX. Instead of acknowledging these deficiencies from the outset, UTMB chose to target Howard Brody as a scapegoat for the institution's shortcomings and to fix their internal issues later.

59.     Even under UTMB's new IHOP Policy 3.2.4, every faculty or administrative personnel who approached Howard Brody, or was interviewed as part of the Title IX investigation, violated the policy to the same or to a greater extent than Howard Brody did.

60.     Pursuant to *Goodyear Tire & Rubber Co. v. Portilla*, 879 S.W.2d 47 (Tex. 1994), UTMB's failure to enforce the 3-day rule in IHOP Policy 3.2.4 waived that portion of the policy. In accordance with the holding in that case, UTMB's consistent failure to enforce the 3-day rule converted that rule into a contractual reason *not* to terminate Howard Brody.

## VI.
### CAUSES OF ACTION

**A.     RETALIATION UNDER TITLE IX**

61.     Plaintiff incorporates paragraphs 1 through 59 herein by reference.

62.     Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), states that "No person in the United States shall, on the basis of sex, be excluded from

participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . ."

63.     Title IX is implemented through the Code of Federal Regulations. *See* 34 C.F.R. § 106.

64.     34 C.F.R. § 106.71 incorporates the requirement from the Title VI regulations, which provides that "[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual . . . because he made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subpart."

65.     Howard Brody was either the target of a Title IX investigation, or participated in the Title IX investigation, depending on which UTMB version of events one chooses to believe.

66.     UTMB had actual knowledge of Howard Brody's participation in the Title IX investigation.

67.     Howard Brody was thereafter subjected to adverse action, treatment, and conditions of employment.

### Specific Instances of Retaliation

68.     Howard Brody was removed from his administrative role as Director of the Institute for the Medical Humanities.

69.     Howard Brody was placed on a leave of absence from October 7, 2014 to October 6, 2015.

70.     Howard Brody was banned from his office and excluded from all electronic communication past and present.

71.     Howard Brody's total compensation was reduced nearly 50% from $271,177.00 to $141,238.00.

72.     Howard Brody was forced to attend a training course in Atlanta, Georgia at his own expense. There is no legitimate business reason why Howard Brody should have to attend a training course in Atlanta, Georgia when there are many similar training course options much closer to Galveston, Texas.

73.     Catherine Riley, the title IX investigator, spent a significant amount of time in the Title IX interviews asking questions about Howard Brody and his leadership abilities that had nothing whatsoever to do with Mark Clark and allegations of sexual harassment.

74.     Howard Brody was advised by a faculty member, interviewed on March 24, that Catherine Riley asked the question "Do you think Howard Brody should be fired?" in that interview. Catherine Riley also indicated to this faculty member that the question was being asked in all of the Title IX interviews.

75.     Notably, UTMB did not provide Howard Brody with any interview transcripts from March 24, although three interviews are documented on that date in the Title IX Documentation Worksheet.

76.     Either Ronald McKinley, Chief Human Resources Officer, lied and misled Howard Brody when he informed Howard Brody there was no investigation against him, or UTMB lied and misled the EEOC when it stated there was a supplemental investigation into Howard Brody.

77.     UTMB has erected hurdles, obfuscated facts, and failed to adhere to their own internal policies throughout this entire incident with Howard Brody.

78.   UTMB has yet to provide Howard Brody with a copy of the mythical supplemental investigation after numerous requests for access in order to adequately defend himself in the faculty grievance hearing.

79.   UTMB did not include a copy of the supposed supplemental investigation as an exhibit to Howard Brody's faculty grievance hearing, presumably because a supplemental investigation never occurred.

80.   If a supplemental investigation occurred, and UTMB did not use the report as an exhibit in Howard Brody's faculty grievance hearing, then it serves as another example of UTMB taking every possible step to actively hinder the free exchange of information and keeping Howard Brody entirely in the dark and guessing as to what is actually taking place with respect to employment decisions made about him.

81.   UTMB focused on events that occurred in 2010, outside the March 2011 to March 2014 window stated in the disciplinary letter, blindsiding Howard Brody at his faculty grievance hearing and depriving him of any chance to defend himself yet again.

82.   UTMB refused Howard Brody access to all his professional publications, manuscripts, documents, and papers for a full year, including but not limited to:

   a.   All professional publications such as books, newspaper articles, magazine articles, and journal articles that Dr. Brody produced, received, and utilized before and during his employment at UTMB;

   b.   All professional manuscripts that Dr. Brody produced, received, and utilized before and during his employment at UTMB;

   c.   All professional documents that Dr. Brody produced, received, and utilized before and during his employment at UTMB;

d. All professional papers that Dr. Brody produced, received, and utilized before and during his employment at UTMB;

e. All working papers of Dr. Brody produced, received, and utilized by him before and during his employment at UTMB;

f. All research materials of Dr. Brody produced, received, and utilized by him before and during his employment at UTMB;

g. All program books and other materials from all conferences, workshops, seminars, and meetings which Dr. Brody either attended, was represented at, or sponsored, before and during his employment at UTMB;

h. All professional files of Dr. Brody produced, received, and utilized by him before and during his employment at UTMB;

i. All teaching outlines, notes, and handouts of Dr. Brody produced, received, and utilized by him before and during his employment at UTMB;

j. All publications, manuscripts, documents and papers of all organizations and societies of which Dr. Brody has been a member or currently is a member;

k. All electronic research produced, received, and utilized by Dr. Brody before and during his employment at UTMB;

l. All electronic documents produced, received, and utilized by Dr. Brody before and during his employment at UTMB;

m. All physical bibliographies produced, received, and utilized by Dr. Brody before and during his employment at UTMB;

n.     All electronic bibliographies produced, received, and utilized by Dr. Brody before and during his employment at UTMB; and

o.     All e-mails produced, received, and utilized by Dr. Brody before and during his employment at UTMB.

83.     In effect, UTMB denied Howard Brody access to his career's entire body of work for one year. Howard Brody made dozens of requests for these materials and UTMB stalled for the entire duration of Howard Brody's leave of absence.

84.     As a result, Howard Brody was not able to do any work professionally, whether related to UTMB or not, from October 7, 2014 to October 7, 2015.

85.     Howard Brody promptly filed a formal grievance on October 8, 2014 pursuant to UTMB's Faculty Grievance Policy and UTMB did not grant that hearing until July 23, 2015, almost nine months later. This delay was due, in part, to UTMB's refusal to give Howard Brody any information about the investigation into his behavior other than the two conclusory sentences contained in his disciplinary letter.

86.     UTMB hid the identity of its attorney in the faculty grievance hearing from Howard Brody, even after numerous requests, preventing Howard Brody's attorney from having any kind of dialogue with UTMB's attorney.

87.     Howard Brody's disciplinary letter states "[t]he above-mentioned behavior will not be tolerated at UTMB." Ironically, UTMB has implicitly condoned this behavior on behalf of every other faculty member and administrative personnel involved in the Mark Clark incident.

88.     Students and employees of UTMB will continue to be subjected to sexual harassment and discrimination without the opportunity for prompt remedial action or

protection if UTMB is permitted to scapegoat Howard Brody for hearing second-hand information and rumors in violation of UTMB's established policies.

89.     UTMB made Howard Brody's work so miserable that he was constructively terminated. Unable to stand it anymore, and unable to continue in his professional activities due to UTMB's actions, Howard Brody was compelled to resign.

## B.     RETALIATION UNDER TITLE VII

90.     Plaintiff incorporates paragraphs 1 through 88 herein by reference.

91.     It is a violation of Title VII for "an employer to discriminate against any of his employees . . . because he has opposed any employment practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

92.     UTMB engaged in an astounding number of retaliatory actions against Howard Brody solely as a result of his participation in its investigation against Mark Clark. The evidence leaves no doubt that but for Howard Brody's participation in the Mark Clark investigation and his opposition to UTMB's unlawful tactics, he would not have been demoted, harassed, penalized, or constructively terminated.

93.     UTMB implemented these material adverse actions against Howard Brody as a direct result of his participation in the investigation. The statement of Ronald McKinley, Chief Human Resources Officer, makes this clear. Ronald McKinley denied that there was any investigation of Howard Brody, only an investigation into the allegations of Mark Clark.

94.     The fact that the material adverse actions were the result of retaliation and not an alleged violation of the 3-day rule is proved by UTMB's failure to enforce that rule

against any other person involved, in spite of its clear applicability to many other administrative personnel and faculty.

95.     UTMB's gross misuse of the investigative process has the direct effect of deterring complaints, deterring participation, and deterring meaningful participation. Should UTMB's investigative practices be allowed to stand, those with complaints will be deterred from bringing them forward in light of UTMB's use of the "investigative process" as a cover for implementing adverse employment actions. UTMB's actions show that those who participate in its "investigative process" then become targets themselves. The "investigative process" is used as a pretext for a witch hunt. This conversion of a precious employment right into a tool of harassment, discrimination, and retaliation is unlawful.

## C.     42 U.S.C. § 1983

96.     "Every person who . . . under color of any . . . regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ." 42 U.S.C. § 1983.

97.     Under color of the 3-day reporting requirement, Howard Brody was deprived of his:

    a.  Access to all his professional publications, manuscripts, documents, and papers for a full year;

    b.  Ability to speak at any conference, regardless of how tenuous the connection was between the subject matter of the conference and Howard Brody's work for UTMB;

    c.  Property interest in tenure status.

## VII.
### DAMAGES

98.    Plaintiff is entitled to compensatory damages equal to the amount of salary, benefits, and other compensation lost as a result of UTMB's unlawful actions. Plaintiff is further entitled to economic damages for the harm caused by depriving him of access to his professional materials, contacts, and work for over a year. Plaintiff is also entitled to the maximum amount of punitive damages available at law. Plaintiff seeks recovery of prejudgment and postjudgment interest on the amounts awarded in the maximum amount permitted.

## VIII.
### ATTORNEYS' FEES

99.    Plaintiff seeks recovery of all attorneys' fees incurred as a result of UTMB's unlawful actions.

## IX.
### DEMAND FOR TRIAL BY JURY

100.    Plaintiff hereby demands a trial by jury.

## X.
### PRAYER

101.    For these reasons, Plaintiff asks for judgment against Defendant and seeks the following damages and other relief:

    a.  Actual damages;

    b.  Punitive damages;

    c.  Attorney's fees;

d.  Prejudgment interest;

e.  Postjudgment interest; and

f.  All other relief available at law or equity.

Respectfully submitted,

By: _____
Katherine T. Mize
State Bar No.: 00784617
Federal Bar No. 15523
katherine.mize@mizepc.com
711 Louisiana, Suite 1900
South Pennzoil Tower
Houston, Texas 77002
Telephone: (713) 595-9675
Facsimile: (713) 595-9670

Counsel for Plaintiff